Case number 17-1468, James Lossia Jr. et al v. Flagstar Bancorp Incorporated. All arguments not to exceed 15 minutes per side. Mr. Ron Ochoa for the appellants. Good morning, Your Honor. Nice to see you. Good morning, Judge Boggs again, Judge Seiler. Your Honor, my name is Ron Ochoa of Cummings-McClory-Davison Ochoa for the appellants. And I had asked the clerk if I could reserve seven minutes for my rebuttal. Your Honor, I hope... You're getting pretty close to opening argument. I hope to be very brief. Your Honor, I know the court materials and is very familiar. This is real simple. All we're asking for is a remand. And there's three really good, compelling reasons.  The first is that the court ignored the fact that there are multiple issues of fact. The second is the court ignored the rule that says you have to give the non-movement the favorable inference. And the third is we couldn't finish our discovery even though we tried. I'll be very brief on each one. This court, the Sixth Circuit, has consistently held if there is a material issue of fact, a trial court cannot grant summary judgment. Here it did, and there are eight material issues of fact. I don't need to go over all of them. Let me just give you a couple. Let me just ask you this question. I'm focused on this language. The bank's policy is to process ACH transactions as they occur on their effective day for the business day on which they are processed. You would agree that's pretty important language for everybody to come to grips with? Yes, Your Honor. Okay, and as I understand your claim, what seems unfair about what happened to your clients is that they tried to structure their transactions to avoid late fees or if they were going to have late fees, as few as possible. Am I getting it right so far? Well, they didn't intend it that way, but that's how – That's like what normal people do. That's what the bottom line would be. Normal people do. If they don't have enough money in the bank, they try to have as few late fees as possible. Yes, absolutely. Your clients sequenced them in a way to do just that, and then unfortunately it gets reversed along the way, right? Yes, Your Honor. But what's complicated about this case is the merchants, which can be either an ATM or you're using a debit card to buy some tickets or something. The merchants are this freestanding player in the system, and they might send their stuff off to the Federal Reserve one day. One might do it every six hours and one might do it every two days. And part of the case – the language that seems hurtful to you is it's not so much a curve. I don't think that helps, but it's the effective date for the business day on which they are processed. And it's that language that makes it, I think, virtually impossible to structure the transactions in a way that minimizes late fees because you just don't know what an ATM bank is going to do, what a retail merchant is going to do, and how quickly they send it. And then this language makes you stuck because of the word effective date. Judge, you are correct. Your assessment is accurate. But what happened here is we have evidence and we had expert testimony that the bank reordered the transactions because when my client went to the bank, the manager said we go from high to low. She told him that, and that's exactly what happened. Now, remember, Wednesday, Thursday – Is it high to low on a given day or high to low like chronologically when the original merchant transaction occurred? What do you mean by high to low? They took the highest one. No, I got that. I got that. But I mean I'm saying for the day in which they get them from the Federal Reserve or the day in which the transaction with the merchant happened. We don't know. That's why discovery was necessary. See, they submitted an affidavit from an employee, which is pure hearsay, referring to the Federal Reserve. It's hearsay. There's no Federal Reserve testimony. We can't even get the documents from them, the original documents from Federal Reserve, to see when they were processed. Judge, you're right. It's hard, but it can be done through discovery. We didn't get the discovery. And we submitted expert witness, a banking expert, who said these merchants, they don't hold the transaction. Well, just tell me this. Do you have a cognizable claim if the sequencing – is your claim that Flagstar has to process this based on the date of the merchant's transactions? Or do you agree the date of the merchant's transactions is irrelevant? No, we believe it is relevant. Okay, so you think Flagstar's duty is you have the transactions over the course of five days, and the time it takes for it to get to Flagstar just turns on the happenstance of what each merchant does, when they get to the Federal Reserve, and when they get to Flagstar. So that's a legal question. How can that possibly be right given the language effective date? So you have to – don't talk about discovery. How does the word effective date consistent with the fact pattern I just gave you? Because that is not what occurred here. My client has screenshots that shows when the bank had it. It shows it. He has – they kept changing it over the course of the four days. Were they all delivered there on the same day or different days? Same day. Same day that they did the transaction. In other words, they would do a transaction on Wednesday. It appeared on Wednesday. They being the bank, not your client. Well, no, my client. When my client did the transaction. He did some things on different days, over three or four days. Yes. Do you dispute that all of these relevant transactions came from the Fed on a single date? Absolutely. You dispute that? Absolutely. Simply only because you don't know. Is that correct? And based upon our experts' affidavit, who said that's not true. The Fed – Sorry, that it's not true that the Fed says this document on this date? Yes, that it's – No, but I didn't think they said that the Fed held it. That if I write a check or if I go online to, you know, Oshkosh B'Gosh or any number of people, they decide when they send it to the Fed, right? Yes. Yes, Your Honor. And the Fed then batches and on some basis sends it to Flagstar. Is that correct? That's what Flagstar says and we contend. The Federal Reserve, first of all, that the financial institutions process it immediately. They don't hold millions of dollars for a day or two. That's number one. Number two, the Federal Reserve doesn't hold on to four days' worth of transactions and then sends it to them. The other thing is when I – So they send it on a daily basis? Yes, and four times a day. Actually, four times a day the Federal Reserve does it. What we've tried to do is find out who at the bank did the reordering. They don't know. Well, how do these screenshots appear? We don't know. Who is the person who would know this? We don't know. Who at the Federal Reserve did you talk to? We don't know. What does the word effective mean in the contract? Effective. Does effective refer to the date of the merchant transaction? Yes. The date the Federal Reserve gets it or the date Flagstar gets it? It would be our contention. It's the date of the transaction. The date of the transaction. So just understanding your theory. Your theory is when it finally gets to Flagstar, their job is to hold on to this stuff for a little while because that's – they have to hold on to it for a couple days to make sure they're processing it from the right date of transaction because, again, you don't know exactly when the merchant is going to send it off. No. See, this is where the discovery is incomplete because I'm trying to get to answering those kinds of questions, Judge. But the word effective is a word. But, Judge, we don't know all the facts because the judge – do you know during oral arguments there was a motion – the magistrate judge had granted and they were appealing was still before the judge. He didn't even consider it. We didn't get – Okay, but your allegation is that effective date means the instantaneous date your client acts, even if it's in the middle of the night, even if it's to a merchant in Hong Kong. No. Effective date when they do it and the bank is aware of it. Who's the they? Your client. When the client transacts it and the bank becomes aware of it. But the bank is only aware of it from the Fed, right? No. No. Because they had that knowledge from the merchant because they posted it on the screen for my client. So my client and any client would have a right to believe that it was processed on that Wednesday and on that Thursday. Judge, are you saying that the record shows that it appeared in the bank before it came from the Fed? Yes, Your Honor. And just as a final question, do you agree that this ACH business would also include checks? I take it in your client's case it was all online, but would it not – I mean, when I do something it sometimes says ACH for a check? Yes. It could be, yes, Your Honor. And I'd like to reserve my time and then – I think we'll give you four minutes for rebuttal. That'll be fine. Okay. Good morning, Your Honors. May it please the Court. Sony Matani for the defendant, FLE, Flagstar Bank. I'm with Miller Canfield. Plaintiffs have appealed the district court's denial of what is plaintiff's fourth version of a breach of contract claim against Flagstar Bank. They've had nearly two years of discovery, and we've produced a fairly lengthy record, which we contend is devoid of any record evidence that Flagstar violated its disclosure agreement with the plaintiffs in any of the three ways that are being alleged. What kind of damages are there if you lose? Is there a liquidated damages provision in the statute, or is this straight breach of contract? If we were to be remanded for further discovery. But there are really no damages in this case either. There have been no real alleged financial damages on the part of the plaintiff. But we don't contend that they – Well, some of the overdraft fees, wouldn't it? I mean, if it had gone the way he wants, he wouldn't have had as many overdraft fees. Well, there's no obligation on our part to have it go the way that he wants. Well, I'm just saying that if you were to lose on the merits, there's some damages. True. But in this particular case, we actually comported with our disclosure agreement. Judge Sutton was apt to point out that our language is that we process these ACH transactions as they occur on their effective day, on the business day on which they are processed. But what's also important to remember is – I'm sorry, just to make sure I get your theory. Your effective date for the business day on which they are processed, that's the day Flagstar receives it? It's the day that the Federal Reserve tells us to process them. And this was the point I was going to make. If you look at the very beginning of our disclosure agreement, we say everything in the agreement is subject to our payment processing rules, which are those NATCHA processing rules issued by the National Automated Clearinghouse Association. Those rules – and they're attached to our submission at the record evidence at 79-5. Those rules very specifically lay out what the effective date is. And it's very clear that the bank never sets that date. And they disprove the idea the effective date could be the day of the merchant transaction. Absolutely, Your Honor, because they – They disprove that it would be the date of the merchant sends the stuff to the Fed. Exactly, Your Honor, because we can't do anything until we actually get it from the Fed, and the Fed can't actually process it until it's received from the merchant. You process it against the client's bank account on the day you receive it, or you go back to the date on which it was written in? No, we process it on the day that the Fed tells us to process it. So in this particular case, the record evidence is clear and it's undisputed that the Fed actually transmitted these files late on Sunday evening at 9 p.m. and again on Monday morning at 3.30 a.m. And Carolyn Barlow averred in her affidavit that that is exactly when those files were received by us. There is no record evidence to suggest that we did not receive those files on those dates. So they're processed for the Sunday night or for the Monday when you have a business day? They're processed on the Monday, which is that tail end of our agreement, which says for the business day on which they are processed. So they will be processed on that Monday. But the Fed is the one that tells us. The Fed also told us in the ACH file that they sent us what the effective date was, and so we followed that effective date. So if you get several on Sunday and several on Monday, then they all lump together or are they set in order of the biggest one to the lowest or the smallest to the biggest, or just put in there and say, use this against the bank account? That is a very good question, Your Honor. And so if you look at the record at 62-11, we submitted a file that was uploaded by the Federal Reserve to our system, which is the ACH file that we received from the Federal Reserve on that Sunday night and on that Monday morning. And if you can see in the file, these transactions are just provided to us in random order of merchant. And so the merchant sends all of its transactions that were conducted for that merchant, not just the plaintiff, but every single person who conducted a transaction, they're received in batch. And so we process them in the order that they are actually presented to us. But when the merchant sends it to the Fed, presumably then the Fed sorts them all out. So everything that comes from Kmart, the ones that are for your client go into that file and all the rest of them go into somebody else's file. I would assume that that's the case, but, Your Honor, just to be clear, there's no record evidence on that, in part because it's not really relevant. I understand, but just physically, when we think about how this happens, the merchants upload them in batches for all customers. The Fed then sends you the ones for this particular account. Now, if I understand your adversary, the two points that he seems to make that would be contradictory or at least raise confusion would be, number one, he seemed to say in answer to my question, the bank knew about all this stuff before it ever got it from the Fed. And, secondly, he says that some employees said, oh, yeah, we reordered them high to low. What do you have to say about those? Well, there's no record evidence of the testimony from the employee who says we reordered them from high to low. And the record evidence... He's just making that up? His plaintiff may have had that conversation, but it's not anywhere in our record. Well, we'll see what he says. But what I will say is in the record is that we have not only the policy that shows how we reorder the transactions now, which is not from high to low, but in the order they occur in the Federal Reserve file. That is in our record. In addition to that, we've got the affidavit, and we've got two depositions that have been taken of our first vice president and retail and commercials operating director. You're not answering my question about his statement that you had all this information before you ever got it from the Fed, which might at least undermine the notion of what is an effective date or what is the date of processing. We don't have all of this information before we get it from the Fed, and the record shows that. What he's referring to are the online banking display screens, and if you look at the record, he checked those online banking display screens on March 2nd, which is... March 2nd is what? March 2nd is the date after which we got... Is that the Monday we're talking about? It's the Monday, yes. And so that is when we would have had notice, obviously because we'd received the file on the Sunday night, March 1st, and early Monday morning. But then he says that those screens on the Monday are different from the order in which you say you have the file and the record from the Fed. Correct. The online banking display screens, the record evidence shows, they are not evidence of how we process the actual transactions. There are screens, and you can check it, and it's for the customer's understanding of what's coming through and when. But the evidence as to when we actually process the transactions, the record evidence shows, are the actual bank statements that the customer receives. And when you look at the actual bank statements that the customer received here, they are processed, those transactions that he's challenging, in the exact same order that they appear in the ACH file that we received from the Fed. This is another way, I think, of asking this question. When I heard this was an insufficient funds case, fee case, I smiled and thought, I can't wait because this whole thing really aggravates me, and you guys owe me a lot of money. I really don't like these things. But the law is the law, so we have to apply it in a principled way. But I do have this question on behalf of, I think, 320 million people. Why would you not, when you get the batch, reorder it within the batch? Everybody knows the average consumer tries to, you know, they're struggling. They're trying to do this in an order. I can understand why the merchant doing it a day later, and you can't account for that. I totally get that. But I don't understand why, when you get a batch, you can't figure out very quickly the sequencing the consumer used and honor that sequencing. That just seems like gamesmanship. Because we're never provided the actual date on which the customer initiated the transaction. All we are provided is the effective date that the Federal Reserve gives us. That's not accessible information? I mean, I'm willing to believe you that Flagstar doesn't know it, but I wonder if it's because Flagstar doesn't want to know it. Our record shows that Flagstar never gets that information. Can it get that information? That I do not know, Your Honor. I do not know. I would contend that's not necessarily the issue before us. But here's the other reason why we can't necessarily do that. What we do do, according to our own internal rules, is process deposits first. So we make sure that those deposits come in first so that the bank account is supplemented as fully as possible. But the deposits aren't coming from the Fed. They're coming from yourself, right? Well, no, we get deposit transactions as well that are separate from the debit withdrawal transactions. Okay, let me go back. As I understood the record, and help me if I'm wrong, there was a time when you did reorder the sequence to your advantage. That is, you in fact did high to low. You stopped doing that, and now you say you just do it randomly. But that would mean that you do have the information by amount. That doesn't mean that you had the information by date of transaction. But if you wanted to be nice, at one time you had enough information to reorder them high to low. If you wanted to be nice, you could reorder them low to high. Yeah, what's the answer to that? That's the question I wanted to ask. Well, the bank would answer the question as saying, and I would answer the question on behalf of the bank as saying, we process according to best practices. And best practices say that we're doing it. Most profitable practices. Well, they're not necessarily most profitable. They're random. They're random. And they're not even random. They're in the order that they're given to us by the Federal Reserve. It's more profitable than doing low to high. That's true. Yes, it's the best equals most. But if we were going to do best equals most, which again I would contend is not relevant here because that high to low transaction processing is not at issue here. We get it. We have to follow the contract. Yeah. I'm going to do that. I suppose that even though in days of computers it just requires some programming time, what you do now, according to your argument, is you just take it from the Fed and you do it. You don't have to massage it. You don't have to process it in any way. Obviously you can do it because you used to do it. Presumably the programmers could do it, but then you'd have a new program and the programmers would have to kludge it every time something went wrong. Well, and we would also be inputting our own subjective judgment into the process, whereas now we have a pretty objective process that we follow, which is provided to us. Not a terrible inference. It assumes a rational consumer. Well, but that. But not every consumer is rational, Your Honor. So what we take, I mean, we can assume. Why would they pay $3 to take $20 out of the ATM? It's an unbelievable business. We don't necessarily know the order in which these transactions are processed, right? No, I know, but it's the most consumer-friendly thing to do. But anyway, yeah, the contract is what the contract is. Yes, yes. And I do want to address the point that the plaintiffs' counsel made about the affidavits of the two experts that were submitted. I would point the Court to the case that was actually provided by the plaintiffs, Alpert v. U.S., in their brief. That case particularly examined when and whether a party intended to discharge a particular debt, and affidavits were submitted in support of the particular date of discharge. And Judge Seiler, you and Judge Gibbons and Judge Rogers in that case collectively ruled that an affidavit offered in opposition to summary judgment shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein. And then the panel promptly excluded the statements by the affiants because they reflected practices of other companies, were based upon simple belief, and they didn't really demonstrate personal knowledge. And we would contend that the two affidavits that have been submitted here by the plaintiff's so-called experts are exactly like those that were submitted in Alpert. And if you actually take a close look at them, the first 20 paragraphs talk about a lot of experience, but no experience with processing bank transactions. And then both affiants talk about what generalized, unspecified merchants might do. And because those merchants may or may not actually submit their transactions, or they're incentivized for a profit purpose, right, to submit their transactions as soon as possible, that necessarily means that Flagstar's file that it received from the ACH is somehow manipulated or doctored. All of that is not based on any record evidence. It's not based on any Flagstar data. It's not based on any Flagstar testimony. It's not based on anybody testifying from the Federal Reserve. We'll note that plaintiff had two years to conduct discovery and never once contacted the Federal Reserve to try to determine whether their file matched what was uploaded into our system. They never once contacted anyone at the Federal Reserve to actually provide testimony about exactly how the process works and how we received these particular files. So these affidavits are really lacking in anything other than speculation and conjecture about what Flagstar does. It's not even based on what the actual merchants did in this particular case. Did the plaintiff need more time for discovery? He's brought this up. Well, we had two years of discovery, and in the underlying Rule 56 motion, the plaintiff did not base that motion on Rule 5060, which would ask for further discovery or additional facts. I mean, we would argue two years was ample time to actually conduct discovery. And we would note that the actual underlying magistrate order that he referred to, which granted some discovery, it granted some limited discovery, but it did not grant any broader discovery. And nothing was limiting the plaintiff from actually being able to get this additional discovery that they wanted. And in fact, we've produced more than 8,000 pages of information. So my time is almost up. I would remind the Court that the standard, while on summary judgment, is looking at the facts favorable in light of the plaintiff. There's also a burden once you have a motion for summary judgment to actually consider whether there are genuine issues of material facts. And we would contend that this record shows that there's really no genuine issue of material facts in this case. And so we'd ask that you affirm the lower court ruling. All right. Thank you. Thank you. Your Honor. You asked exactly the right question. The fact of the matter is counsel made a representation which is inaccurate. My client didn't look Monday. He looked every single day, which is how he got the screenshots, to find out what his balance is. Like you had said at the very beginning, you want to minimize your NSFs. So he was checking the balance. So as he's doing more transactions, they had sufficient money. He made a mistake on the last one. Their policy, their procedure says no more than five NSFs. They charged him eight. They represented to the court, well, we manually do that later. They took care of it the next day, didn't they? No. No, they didn't. My client went to the bank, complained. And then they did? Then they reduced it by three. But here's what happened, Judge. Because they kicked eight, those merchant transactions resulted in a penalty. Because, you know, when you make a payment and then it's NSF, then you get hit again. So not only did they get hit $36 by eight, then they get hit by the merchant as well. They presented an affidavit that is based on hearsay. We want to get to the Federal Reserve, but we didn't take the debt yet. Discovery wasn't closed. Counsel, I mean, I think all of us here get the equities of your position. And I'm going to guess we all side with the equities of your position. You still have to come to grips with this language. And I don't – I just have not heard you yet present a theory of that language that adds up. So you don't have to use your time that way, but I'm just telling you that's the way to convince at least one member of the panel, is to deal with the language of the contract and explain how that lines up with the equities. Because if you read the rest of the language it said, that they can change it, that they don't have to follow it. I have it in my reply brief. They don't have to follow it. Where does it say that? Let me find the reply brief. I just had it here. Not found it. Here it is. Oh, here it is at bottom of page two. Except to the extent that this agreement can and does vary such rules or laws. So in other words, they – This agreement varies such rules and laws. Right. In other words, they don't have – Not that they willy-nilly can vary such rules and laws. But that's – You have a citation of what you're – not from your page number, but from what you're reading from in terms of where it is in the record. It's in the agreement. It's in the deposit agreement. Judge – Is that at 3486 or do you know? I'm not sure, Judge. All right. We'll look it up. But we want to get some discovery on the Federal Reserve once we – the words of the contract and what they mean and why you need more discovery. That's – if you keep talking about Rule 56, it's just not going to do much good. But they made representations to you, which the court accepted as fact, that they process it according to the Federal Reserve, right? There's no evidence to that. There's an affidavit – All right. So that's a good point. So, in other words, the idea that they get this batch from the Federal Reserve, you think that's not supported in the record. Okay. We'll look for that. And our affidavit from our expert, our banking expert, said that cannot be. So the judge is supposed to give the facts in the light most favorable – This is the file that we got from the Fed. Is that correct? Yes, Your Honor. And if we look in the record, we will see this file, which is the way they processed it, which they say is what they got from the Fed. No. What you'll see is what they prepared, not the original that was brought from the Federal Reserve, which we've asked them for. Show us what you got from the Federal Reserve. So what do you mean, the original? In other words – I thought that's what their affidavit says, we got this from the Fed. That's what they say. But you want to look at the underlying document that they received from the Federal Reserve, which they will not provide us. The document from the Fed is a bunch of electrons. It'll be documents that will show it as they represent it. If you ask for a computer file? What we're saying is we don't believe it. If you ask for a computer file, for example? Whatever they use in defense of their position, that they said to you, this is how we do it. This is how we get it. We don't have the original. I think we get your point. I'm sorry. I apologize. I told my client I wouldn't be emotional. I didn't mean to be. It just said some representations were made, which is not accurate. I would respectfully ask the court to look at – I think I was more emotional than you were. Don't worry about it. All right. Thank you for your briefs. We appreciate it. Thank you for answering our questions and for your oral arguments. We do appreciate the tolerance and forbearance that you've given us. Thank you. The case will be submitted, and the clerk may call the next case.